1   LINDA BALDWIN JONES, Bar No. 178922
    ANDREA LAIACONA, Bar No. 208742
2   WEINBERG, ROGER & ROSENFELD
    A Professional Corporation
3   1001 Marina Village Parkway, Suite 200
    Alameda, California 94501-1091
4   Telephone 510.337.1001
    Fax 510.337.1023
5
    Attorneys for Plaintiffs
6

7                                                                        **EMC**

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                    CV   08        3574

11  PAUL BENSI, BART FLORENCE, JERRY       ) No.
    KALMAR, and LYLE SETTER, in            )
12  their capacities as Trustees of the PENSION  ) **COMPLAINT FOR WITHDRAWAL**
    FUND OF STATIONARY ENGINEERS           ) **LIABILITY**
13  LOCAL 39                               )
                                           )
14            Plaintiffs,                  )
                                           )
15       v.                                )
                                           )
16  FHR CORPORATION, a Nevada Corporation, )
    doing business as RENO HILTON,         )
17                                         )
              Defendant.                   )
18  _____  )

19       Plaintiffs complain of Defendant, and for cause of action allege:

20                **JURISDICTION AND INTRADISTRICT ASSIGNMENT**

21                                   **I.**

22       This action arises under and is brought pursuant to Section 502, 4221(b), 4301 of the

23  Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. §§1132,

24  1401(b), 1451 and Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. §185.

25  Pursuant to Sections 502(e)(2) and 4301(d) (29 U.S.C. §§1132(e)(2), 1451(d), venue properly lies

26  in this district court since the Pension Trust is administered in the City and County of San

27  Francisco.

28  ///

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

**PARTIES**

**II.**

Plaintiffs Paul Bensi, Bart Florence, Jerry Kalmar, and Lyle Setter were and are Trustees and together comprise the Board of Trustees of the Plaintiff Stationary Engineers Local 39 Pension Trust Fund ("Trust Fund").  At all times material herein, the Trust Fund was, and now is, an employee benefit plan created by a written Trust Agreement subject to and pursuant to section 302 of the Labor Management Relations Act (29 U.S.C. § 186), and a multi-employer employee benefit plan within the meaning of sections 3, 4 and 502 of ERISA (29 U.S.C. §§ 1002, 1003 and 1132). The above-named Trust Fund is administered by a Board of Trustees which may bring this action in the name of the Trust Fund pursuant to the express provisions of the Pension Trust Agreement. The Trust Fund and its respective Board of Trustees shall hereinafter be designated collectively as "Plaintiffs".

**III.**

At all times material herein, Defendant FHR Corporation, a Nevada Corporation, doing business as Reno Hilton ("FHR Corp. dba Reno Hilton") has been an employer within the meaning of Sections 3(5) and 515 of ERISA (29 U.S.C. §§1002(5), 1145) and an employer in an industry affecting commerce within the meaning of Section 301 of the LMRA (29 U.S.C. §185).

**CLAIM FOR RELIEF**

**IV.**

At all relevant times, Defendant FHR Corp. dba Reno Hilton has been a party to and bound by a written collective bargaining agreement with the International Union of Operating Engineers, Stationary Local No. 39 (hereinafter "Union"), a labor organization within the meaning of section 301 of the Labor Management Relations Act (29 U.S.C. § 185).  Said collective bargaining agreement obligated said Defendant to make regular and timely contributions to the Trust Fund on behalf of all those employees performing covered work. Defendant FHR Corp. dba Reno Hilton signed the collective bargaining agreement effective June 20, 2004, a copy of which is attached hereto as Exhibit "A" and incorporated herein as though set forth at length.  By virtue of signing said Collective Bargaining Agreement and making payments to the Trust Fund, said Defendant

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 2 -

1  agreed to accept and be bound by all the terms, provisions and conditions of the Collective

2  Bargaining Agreement and the Trust Agreement under which the Trust Fund was established and

3  any amendments thereto.

4                                                    **V.**

5       The above-mentioned Collective Bargaining Agreement and Trust Agreement provide for

6  prompt payment of all employer contributions to the Trust Fund and for liquidated damages, not as

7  a penalty but as a reasonable attempt to provide for payments to cover the damages incurred by the

8  Trust Fund, in the event of a breach by the employer, where it would have been impracticable or

9  extremely difficult to ascertain the Plaintiffs' losses.

10                                                   **VI.**

11      The Trust Agreement and Collective Bargaining Agreement also provide for the payment

12 of interest, attorney's fees and all other costs incurred by the Plaintiffs in the collection of any

13 delinquent payment.

14                                                   **VII.**

15      ERISA Section 515 (29 U.S.C. §1145) provides that every employer who is obligated to

16 make contributions to a multi-employer plan under the terms of the plan or under the terms of a

17 collectively bargaining agreement shall, to the extent not inconsistent with law, make such

18 contributions in accordance with the terms and conditions of such plan or such agreement.  Under

19 ERISA, the court shall award the plan:  unpaid contributions; interest on unpaid contributions; an

20 amount equal to the greater of interest on the unpaid contributions or liquidated damages provided

21 for under the plan; reasonable attorney's fees and costs of the action; and such other legal or

22 equitable relief as the court deems appropriate.

23                                                   **VIII.**

24      ERISA Section 4201 (29 U.S.C. §§ 1145) further provides that the Trustees shall have the

25 authority to assess withdrawal liability against contributing employers who terminate participation

26 in the Plaintiff Trust Fund for any reason.  The withdrawal liability shall be determined as set forth

27 in ERISA, and an employer shall be liable for withdrawal liability if it terminates participation in a

28 benefit plan maintained by the Trust Fund.  The withdrawal liability shall be due and payable by

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

Complaint for Withdrawal Liability

1  the employer upon demand by the Trust Fund.

2  **IX.**

3  By virtue of the above-mentioned agreements, Defendant FHR Corp. dba Reno Hilton

4  became a contributing employer to the Plaintiff Trust Fund.

5  **X.**

6  In 2006, Defendant FHR Corp. dba Reno Hilton withdrew participation from Plaintiff Trust

7  Fund and ceased to contribute to the Plaintiff Trust Fund thereby completely withdrawing from the

8  Trust Fund.  Under Section 4201 of ERISA (29.U.S.C. § 1381), an obligation exists upon an

9  employer that withdraws from the Trust Fund to pay an amount known as "withdrawal liability" as

10  determined by the Board of Trustees pursuant to the applicable statutory, administrative and

11  contractual provisions.

12  **XI.**

13  In 2007 and pursuant to Sections 4202 and 4219 of ERISA (29.U.S.C. §§1382, 1399),

14  Plaintiff Trust Fund calculated the amount of the withdrawal liability of Defendant.  The Trust

15  Fund calculated Defendant's withdrawal liability to be in the amount of $407,265.96.  Under the

16  payment schedule, Defendant is required to make 5 full quarterly payments of $70,804.25 with a

17  final payment of $70,978.67.  The first payment was due within 60 days after the date of the notice

18  and the final payment due in 2008.

19  **XII.**

20  On or about August 2, 2007, Plaintiff Trust Fund notified Defendant that its withdrawal

21  liability to Plaintiff was $407,265.96, and demanded payment.  Said notice also informed

22  Defendant of its right to make a lump sum payment of the entire amount or make payments

23  according to the payment schedule.  Said notice informed Defendant that Defendant must make its

24  payments to Plaintiff Fund even if Defendant requests a review of the withdrawal liability

25  determination.  Said notice informed Defendant of the components of the withdrawal liability and

26  included documentation.  A true and correct copy of Plaintiff Trust Fund's notice is attached hereto

27  as Exhibit "B", and incorporated herein by reference.

28  / / /

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 4 -
Complaint for Withdrawal Liability

**XIII.**

On or about October 2007, Defendant FHR Corp. dba Reno Hilton paid its first withdrawal liability quarterly payment in the amount of $70,804.00 to the Plaintiff Trust Fund. Except for the first quarterly payment, Defendant has failed, refused, and neglected to make one or more of the required payments of withdrawal liability to Plaintiff Trust Fund.

**XIV.**

On or about February 6, 2008, Plaintiff Trust Fund notified Defendant FHR Corp. dba Reno Hilton that it failed to submit a quarterly payment and that the withdrawal liability would be in default if said payment with interest was not received within 60 days after receipt of said letter. Defendant failed, refused and neglected to respond.

**XV.**

Under Sections 515, 4219(c)(5) and 4301(b) of ERISA (29 U.S.C. §1145, 1399(c)(5), 1451) and the Trust Agreement, such a failure to make a withdrawal liability payment is considered a default and thus a delinquent contribution. Section 4219(c)(5) of ERISA (29 U.S.C. §1399(c)(5) provides that in the event of a default, a plan sponsor may require immediate payment if the entire amount of outstanding withdrawal liability, plus accrued interest on that total amount of outstanding liability from the due date of the first payment which was not timely made. On or about April 9, 2008, Plaintiff Trust Fund notified Defendant FHR Corp. dba Reno Hilton that it was in default with regards to its withdrawal liability obligation and demand was made for the immediate payment of the outstanding withdrawal liability pursuant to Section 4219(c)(5) of ERISA (29 U.S.C. §1399(c)(5)).

**XVI.**

Defendant FHR Corp. dba Reno Hilton has failed, refused and neglected to remit its outstanding withdrawal liability with interest and the total outstanding withdrawal liability is now due and owing. As such, Plaintiffs are forced to bring the present action to collect withdrawal liability plus interest, liquidated damages, attorneys' fees and costs and such other legal or equitable relief as the Court deems appropriate.

/ / /

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337 1001

**XVII.**

Defendant FHR Corp. dba Reno Hilton failed to request a review or appeal of determination pursuant to ERISA §4219(b) and has waived all defenses to this action. Defendant FHR Corp. dba Reno Hilton has also failed to satisfy the requirements for the sale of assets exemption under ERISA §4204 for a number of reasons, including its failure to obtain a bond or establish an escrow account.

**XVIII.**

By reason of the foregoing, Defendant is indebted to Plaintiff in the sum of $407,265.96 minus any payments received as withdrawal liability or alternatively the amount of withdrawal liability according to proof, together with interest thereon, liquidated damages, attorney's fees, and other costs in accordance with the Trust Agreement and Sections 4301(b) and 502(g) of ERISA (29 U.S.C. §§ 1451(b), 1132(g)).

**PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment against the Defendant as follows;

1.    For the sum of 407,265.96 minus any payments received as withdrawal liability, or alternatively the amount of withdrawal liability according to proof, as provided for under the Trust Agreement and in accordance with the delinquent contribution provisions of ERISA (29 U.S.C. §§ 1132(g)(2)(A), 1145, 1381 et seq.);

2.    Interest in accordance with the Trust Agreement and Sections 502(g)(2)(B), 1399(c)(5) of ERISA, (29 U.S.C. §§1132(g)(2)(B), 4219 (c)(5));

3.    Liquidated damages provided for under the Trust Agreement and in accordance with Sections 502(g)(2)(C) and 4301(b) of ERISA (29 U.S.C. §§ 1132(g)(2)(C), 1451(b)) or double interest;

4.    Reasonable attorney's fees and costs incurred herein in accordance with the Trust Agreement and Sections 502(g)(2)(D) and 4301(e) of ERISA (29 U.S.C. §§1132(g)(2)(D), 1451(e)); and

/ / /

/ / /

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 6 -
Complaint for Withdrawal Liability

1      5.     For such other and further legal and equitable relief as this Court deems just and

2   proper.

3   Dated: July 24, 2008

4                                              WEINBERG, ROGER & ROSENFELD
                                               A Professional Corporation
5

6                                              By: *[signature: Linda Baldwin Jones]*

7                                              LINDA BALDWIN JONES
                                               ANDREA LAIACONA
8                                              Attorneys for Plaintiffs

9   115760/497528

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

# COLLECTIVE BARGAINING AGREEMENT

Between



And

# INTERNATION UNION OF OPERATING ENGINEERS STATIONARY LOCAL NO. 39 AFL-CIO

June 20, 2004

To

June 19, 2009

EXHIBIT A

# TABLE OF CONTENTS

| Article Number | Article Name | Page Number |
|---|---|---|
| 1. | Purpose of the Agreement | 2 |
| 2. | Recognition | 2 |
| 3. | No Discrimination | 2 |
| 4. | Management Rights | 3 |
| 5. | No Strikes or Lockouts | 3 |
| 6. | Grievances | 4 |
| 7. | Hiring | 5 |
| 8. | Hours of Work and Overtime | 6 |
| 9. | Seniority | 6 |
| 10. | Termination | 8 |
| 11. | Leaves of Absence | 8 |
| 12. | Safety and Health | 8 |
| 13. | Bulletin Boards | 8 |
| 14. | Group Welfare, Vacation, Holiday and Pension Benefits | 9 |
| 15. | Call-Back Pay | 10 |
| 16. | Subcontracting | 10 |
| 17. | Union Representatives | 10 |
| 18. | Tools – Transportation – Clothing | 11 |
| 19. | Jury Duty | 11 |
| 20. | General | 11 |
| 21. | Apprenticeship | 12 |
| 22. | Wages | 12 |
| 23. | Complete Agreement and Waiver | 12 |
| 24. | Union Security | 12 |
| 25. | Duration | 13 |
| Appendix "A" | Schedule of Wages | 14 |
| M.O.U. #1 | Lead Persons | 15 |
| M.O.U. #2 | LRAP | 16 |
| M.O.U. #3 | Shift Differential/Paid Sick Leave | 17 |
| M.O.U. #4 | Pension | 18 |

**AGREEMENT**

This Agreement is by and between FHR Corporation, d/b/a Reno Hilton (hereinafter referred to as the "Company") and International Union of Operating Engineers Stationary Local No. 39, AFL-CIO (hereinafter referred to as the "Union"), and applies to the Company's facility at 2500 East Second Street, Reno, Nevada.

## ARTICLE 1
## PURPOSE OF THE AGREEMENT

1.1          It is the intent and purpose of the Company and the Union to set forth the entire agreement between them covering rates of pay, wages, hours of work and other conditions of employment for the employees covered by this Agreement; to secure the efficient and profitable operation of the Company; to promote and sustain the maximum productivity of each employee covered by this Agreement; and to provide the procedure for the prompt and peaceful settlement of grievances which may arise between the Company and its employees or the Union to the end that there shall be no interruption of the Company's operations, work stoppages, strikes, slowdowns, honoring of picket lines or other interferences with the Company's operations during the term of the Agreement.

## ARTICLE 2
## RECOGNITION

2.1          The Company, pursuant to it obligations under the National Labor Relations Act, recognizes the Union as the exclusive collective bargaining representative for its employees as certified in NLRB Case No. 32-RC-1731: "All engineering department employees employed by the Employer at its Reno, Nevada facility, including all draftsmen, carpenters, engineers, locksmiths, painters, upholsterers, and engineering department laborers; excluding al other employees, including office clerical employees, all professional employees, life safety persons, warehouse clerks, work order clerks, laundry department laborers, guards and supervisors as defined in the Act".

2.2          The parties agree that, in accordance with their stipulation at the hearing in NLRB Case No. 32-RC-1731, the following positions are supervisory:  Director of Property Operations and Assistant Director of Property Operation, Laborer Foreman, and Carpenter Foreman. The parties further agree that the Company may establish new supervisory positions as it determines such positions to be necessary.

2.3          Recognition of the Union as bargaining agent is not intended as a guarantee, implicit or implied, that any work currently or subsequently performed at the Company shall continue to be performed at the Company or as a guarantee of employment to any employee.

2.4          The word "employee" as used in this agreement shall mean a person included within the bargaining unit.

## ARTICLE 3
## NO DISCRIMINATION

3.1          There shall be no discrimination, restraint or coercion by the Company or the Union for or against any employee because of membership or non-membership in the union.

3.2          The Company and Union agree not to discriminate in the administration of the Agreement against any employee on the basis of race, color, creed, union activity, sex, age, or national origin within the requirements and limitations of applicable federal and state statutes.

3.3          The Company and the Union agree to take all steps necessary to comply with the Americans with Disability Act.

2

## ARTICLE 4
## MANAGEMENT RIGHTS

<u>4.1</u>        All management rights, powers, authority and functions, whether heretofore or hereafter exercised, and regardless of the frequency or infrequency of the exercise, shall remain vested exclusively in the Company. It is expressly recognized that such rights, powers, authority and functions include, but are by no means limited to: the full and exclusive control, management and operations of the Company's business and its facilities, the determination of the scope of its activities and the methods pertaining thereto, the location of its operations, the materials and products to be acquired or utilized, and the material and equipment to be utilized, and the layout thereof; the right to establish or change shifts, schedules of work and production schedules and standards; the right to establish, change, combine or eliminate jobs, positions, job classifications and descriptions; the right to introduce new or improved procedures, methods, processes, facilities, materials and equipment or make supervisors or other non-bargaining unit employees; the right to maintain order and efficiency, the right to contract or subcontract any work; the determination of the number, size and location of its facilities, and the extent to which the means and manner by which its facilities, or any part thereof, shall be operated, relocated, shutdown or abandoned; the right top terminate, merge, consolidate, sell or otherwise transfer its business or any part thereof; the right to make and enforce safety and security rules and rules of conduct; the determination of the number of employees to be employed in the bargaining unit and the number assigned to any particular operation; the right to determine job assignments; the right to change, increase or reduce the workforce, and the direction of the working forces, including but not limited to hiring, selecting and training of new employees, and suspending, scheduling, assigning, discharging, laying off, recalling, promoting, retiring, demoting, and transferring of its employees.

<u>4.2</u>        It is the intention of the Company and the Union that the rights, powers, authority and functions referred to herein shall remain exclusively vested in the Company except insofar as specifically surrendered or limited by express provisions of this Agreement.

<u>4.3</u>        The Company requires employees to observe Company Rules and regulations as are presently in effect, or which may be established, changed or modified from time to time. The Union has the right to grieve the application of such rules and regulations. Every effort will be made to provide a copy of the proposed general policy change to the Union prior to implementation.  When rules and regulations apply solely to the Property Operations Department, the Union will be advised in advance and their input solicited before implementation.

## ARTICLE 5
## NO STRIKES OR LOCKOUTS

<u>5.1</u>        During the term of this Agreement, neither the Union nor any employee shall:

    (a)  engage in or in any way encourage, satisfaction, or condone any strike, slowdown, concerted stoppage of work, honoring of a picket line, or other action which interrupts or interferes with work or the Company's operations;
    (b)  picket the Company's facilities or in any other way prevent or attempt to prevent free access to such facilities.

<u>5.2</u>        The proscriptions established in this Article apply not only where it is claimed that the Company has violated this Agreement, but also where it is claimed that the Company has violated some State or Federal Law, such as the Labor-Management Relations Act.

<u>5.3</u>        Any employees who violate the provisions of this Article may be disciplined by the Company. Such discipline may include suspension, demotion, discharge, loss of seniority, loss of vacation pay, or such other discipline as the Company may deem justified. The Union shall be accorded the right to grieve any such discipline of employees, but the sole issue which may be grieved shall be whether or not the employee violated Section 5.1. It is also recognized that discipline for violation of this Article need not be equal among all violators, that officers and stewards bear a special responsibility for observance of this Article, and that the degree of discipline must rest in the discretion of the Company.

<u>5.4</u>        During the term of this Agreement, the Company shall not institute a lockout.

3

## ARTICLE 6
## GRIEVANCES

6.1        For the purpose of this Agreement, a grievance is defined as an allegation that the Company has violated or is violating the provisions of this Agreement. No grievance shall be entertained or processed unless it is submitted to the Company within five (5) workdays after the initial occurrence of the event giving rise to the grievance or the initial date the employee or the Union should have acquired knowledge of the event giving rise to the grievance, whichever occurs later. A grievance over discharge shall be filed not later than five (5) workdays after the action of the Company; a grievance over discipline shall be filed not later than (5) workdays after the action of the Company. Grievances may be initiated by the Union and/or employees in the following manner:

STEP 1:  Any employee who believes he has a grievance shall discuss it with his supervisor either alone or accompanied by a Union representative as the employee may desire. Settlements at Step 1 shall be on a non-precedential basis. The Supervisor's Step 1 answer shall be provided within five (5) workdays from the date of the discussion.

STEP 2:  If the grievance is not settled satisfactorily as provided in Step 1, the specific nature of the grievance shall be referred in writing by the Union to the Director of Human Resources within five (5) workdays after the Supervisor's answer in Step 1. The written statement of the grievance shall be signed by the aggrieved employee(s) or the Union and shall include a statement of the provision(s) of the Agreement alleged to be violated, the names of the aggrieved employees, the events giving rise to the grievance, and the relief requested. If either party requests, in writing, a meeting of the parties, such a meeting will be held for the purposes of exchanging and discussing all available information regarding the grievance. The Director of Human Resources shall attempt to adjust the grievance as son as possible, but shall give his answer in writing to the Union within five (5) workdays after receipt of the written grievance or if a meeting is requested within five (5) workdays after such meeting is held.

STEP 3:  If the grievance is not settled in Step 2 and the Company's final answer is not satisfactory to the Union, the Union may appeal the grievance to a Board of Adjustment by giving written notice of its desire to appeal to the Director of Human Resources within five (5) workdays after the date of the Company's final answer in Step 2. Each grievance must be appealed to the Board of Adjustment separately. The Board of Adjustment shall consist of an equal number of representatives from the Company and the Union. The Board shall meet within five (5) workdays after the receipt of the appeal of the grievance. A decision concurred in by a majority of all members of the Board shall be final and binding on all parties. If a majority cannot agree on a decision, the Company shall give its decision on the grievance within five (5) workdays after the Board meets.

STEP 4:  If the grievance is not satisfactorily adjusted in Step 3 and the Union desires to appeal the grievance to arbitration, a representative of the Union shall give written notice of the Union's desire to arbitrate to the Director of Human Resources within five (5) workdays of the date of the Company's decision in Step 3. In the event the parties are unable to agree upon an arbitrator within five (5) workdays of the appeal to arbitration, the parties will request a panel of five (5) arbitrators from the American Arbitration Association, San Francisco office. The party requesting arbitration shall first strike two (2) names from this list and the other party shall then strike two (2) names and the arbitrator whose name remains shall be deemed selected. The decision of such arbitrator shall be final and binding upon the parties. The arbitrator shall only have the power and authority to interpret and apply the provisions of this Agreement to the grievance presented, and his decision shall apply only to the issue arising out of the facts of such a grievance. The arbitrator shall have no authority to alter, amend, modify, nullify, ignore or add to the provisions of this Agreement either by implication or otherwise. The costs and expenses of arbitration shall be shared equally by the parties, except that each party shall bear the expenses of its own witnesses and representation at the hearing.

6.2        Workday for purposes of this Article is defined as Monday-Friday, 9:00 a.m. – 5:00 p.m. excluding holidays.

6.3        A grievance must be filed and appealed within the time limits set forth above, or the grievance shall be considered settled on the basis of the last answer given. The time limits may be extended only by agreement in writing. Such settlements shall be deemed binding and will be given effect in future disputes of a similar nature. If a Company representative fails to answer a grievance within the time limits provided at a

4

particular step (unless such limits are extended by agreement in writing), the grievance shall automatically move to the next step.

6.4        Grievance discussions and investigations shall take place outside of working hours and in a manner which does not interfere with the Company's operations, except that where the nature of a grievance is such that it could not be investigated outside of working hours, the grievance may be investigated during working hours.

6.5        The procedure established in this Article shall be the exclusive means for resolving claims by the Union or employees as to any matter subject to this procedure and no action involving such a claim shall be filed with any court or administrative agency until this grievance procedure is exhausted.  Any settlement under the procedure established under this Article shall be binding upon the Company, the Union, and the employees and shall preclude any further administrative or judicial relief.

## ARTICLE 7
## HIRING

7.1        The Company will notify the Union at the same time it notifies any other outside labor sources as to the number and classification of employees needed in order to provide the Union an opportunity to refer qualified applicants.  The Company shall be the sole judge of an applicant's suitability, competence and qualifications to perform the work of any job to be filled.

7.2        This Section shall not restrict the Company's right to transfer persons working for it outside of the bargaining unit into bargaining unit positions as new employees or its right to hire new employees from any other source.  The Company shall be the sole judge as to how vacancies are to be filled and as to whom is to be hired and the Company's decision in these matters shall not be subject to the grievance procedure.

7.3        The Company shall provide the Union with the name and job title of all newly hired employees covered by the Collective Bargaining Agreement within ten (10) working days after the date of hire.

7.4        The Union recognizes the Company's right to hire temporary employees to perform work of a limited duration.  The following rules shall apply to temporary employees.

        (a)        The Company will notify the Union of its intent to hire temporary employees and afford the Union with and opportunity for discussion prior to hiring such employees.

        (b)        The period of temporary employment will not exceed six (6) months without the prior approval of the Union.

        (c)        In case of temporary employees who are terminated, such termination will not be subject to the grievance/arbitration procedure set forth in Article 6.

        (d)        Employees hired on a temporary basis who exceed six (6) months of continuous employment shall be given seniority as of their most recent date of hire unless the parties agree otherwise pursuant to paragraph (b) above.

        (e)        During the period of temporary employment, such employees shall not receive any of the benefits provided for in this Agreement.  Temporary employees who are accorded seniority pursuant to paragraph (d) above will become eligible for group insurance benefits provided under this Agreement as of the first day of the month following the grant of seniority.

        (f)        During the period of temporary employment, such employees shall not receive any of the benefits provided for in this Agreement.  Temporary employees who are reclassified to a regular employee shall have their seniority calculated pursuant to Article 9.1.  Each such reclassified employee shall server a probationary period as specified in Article 9.3 from the date of reclassification.  Such employees shall become eligible for benefits in accordance with the requirements set forth in the Company policy.

5

## ARTICLE 8
## HOURS OF WORK AND OVERTIME

8.1        The provisions of this Article are solely intended to establish a basis for the computation of overtime and shall not be construed as guarantee of hours of work per day or per week. There shall be no pyramiding of overtime or other premium pay. Overtime shall not be paid more than once for the same hours worked.

8.2        Eight (8) consecutive hours shall constitute a day's work. All time worked in excess of eight (8) straight-time hours in any workday shall be considered overtime and paid for at one and one-half (1-1/2) times the straight-time rate. Five (5) consecutive days of eight consecutive hours with two (2) consecutive days off shall constitute a workweek unless otherwise agreed to by the employee and Company. Any time in excess of forty (40) hours in any seven (7) day period shall be considered overtime. It is understood that a swing shift employee who works a sixteen hour shift shall receive time and one half for the second eight (8) hours.

8.3        Employees shall not be entitled to premium pay if the eligibility for such pay arises from a change in the employee's work schedule where such change has been requested by the employee.

8.4        Each employee shall receive a thirty minute lunch period on those workdays where he is scheduled for six (6) or more consecutive hours of work and this lunch period shall be considered as part of the employee's regular shift.

8.5        Employees who are assigned to continue to work after the end of their scheduled work shift shall be paid in five (5) minute increments.

8.6        The Company will notify its employees of any changes in shift, days off or hours of work no less than seven (7) days prior to implementation of such changes, except in the case of emergencies. Vacations scheduled in accordance with Article 14.3 shall not be considered emergencies.

## ARTICLE 9
## SENIORITY

9.1        The term "seniority" shall be defined as an employee's length of continuous service with the Company dating from his last date of hire.

9.2        Seniority shall be used as a qualification for benefits expressly provided for in this Agreement. It shall not be deemed to establish any right to the continuation of the performance of any work at the Company.

9.3        Each new employee shall be considered as a probationary employee for his first ninety (90) days of continuous employment. There shall be no seniority among probationary employees, and grievances shall not be presented in connection with the discharge, or layoff of such employees or the failure to recall them. Probationary employees may be laid off, discharged or otherwise terminated in the sole discretion of the Company and such action shall not be subject the grievance procedure of this Agreement. The probationary period of any employee may be extended by the agreement of the Company and the Union. After completing his probationary period, an employee's seniority shall be computed from his last date of hire. No temporary employees being permanently hired upon completion of six (6) months temporary service shall be required to serve probation.

9.4        Employees with the greatest seniority in their department shall have preference for retaining employment in the event of a temporary layoff from a full time position, for being recalled from such a layoff, and for promotion to permanent job vacancies in higher paid job classifications, subject to the Company's judgment as to the qualifications of the employees involved, provided that such judgment shall not be exercised arbitrarily. A Watch/Maintenance Engineer who is not recalled from layoff when a less senior Watch/Maintenance Engineer in another department is recalled may file a grievance on the basis that he has the present skill and ability to perform the work being performed by the recalled employee. However, such grievances may be appealed only to Step III of the grievance procedure, and if the grievance is not resolved there, the Company's decision shall be final. For the

6

purpose of this Section, seniority shall be completed on the basis of the total amount of time an employee has worked within his present classification. The classifications within which seniority is to be applied are as follows:

1.     Watch/Maintenance Engineer
2.     Apprentice Engineer]
3.     Utility Engineer
4.     Draftsman

Seniority shall apply within the following departments of the Watch/Maintenance Engineer classification: carpentry, engineering, painting, and upholstering. A current seniority list shall be posted on the Department Bulletin Board at all times, and a copy shall be provided to the Union.

The applications of this Section is limited to temporary layoffs from full time positions, recalls from such layoffs, and promotions to permanent vacancies. Nothing in this Section shall limit or restrict in any way the Company's right to assign particular duties to employees within or outside of their regular classification or department or to move employees within their classification, so that the Company may temporarily or permanently assign, reassign, or transfer employees from one classification or department to another to perform work for part or all of a shift of a regular or irregular basis. If the Company permanently reassigns an employee within his classification from one department to another, his seniority in his new department shall include the time spent working in his prior department. Employees with less than six (6) months of service who are temporarily laid off shall retain rights for six (6) months. Employees with more than six (6) months of service who are temporarily laid off shall retain recall rights for one (1) year. In case of temporary layoffs, probationary employees shall be laid off before non-probationary employees. Terminations by the Company under Article 11 shall not be considered to be layoffs subject to this Section. Whenever possible, the Company will give as much advanced notice of layoff as possible. Such notice will be provided to the extent not inconsistent with the Company's business needs and confidentiality concerns that are reasonable under the circumstances at the time.

(a)     Seniority earned by Watch/Maintenance Engineers while employed (after the ratification of this Agreement) with the Company as Apprentice Engineers shall count towards calculating seniority, for layoff purposes only, provided there was no break in service between the changes in classification.

9.5     Seniority and the employment relationship shall be terminated when an employee :
(a)     quits;
(b)     is terminated by the Company;
(c)     is laid off and fails to report for work within three (3) days after having been recalled by written notice sent to the employee's last known address on file with the Company, with a copy to the Union.
(d)     does not report for work at the termination of an authorized leave of absence of furnish an excuse satisfactory to the Company for failure to report;
(e)     falsifies the reason for a leave of absence or is found to be working during a leave of absence without the Company's express prior approval for the employee to work during the leave.

9.6     Nothing in this Article shall limit the Company's right to transfer employees temporarily from one job or assignment to another.

9.7     An employee transferred to a position with the Company outside of the bargaining unit shall retain seniority for one (1) year. Employees who return to the bargaining unit within the one (1) year period shall return to the next available job opening in their prior classification subject to their skill and ability to perform the available work. Said employee shall continue to accrue bargaining unit seniority for the one (1) year. In the event the employee does not return to the bargaining unit within one (1) year, they shall forfeit their bargaining unit seniority.

9.8     Seniority, as defined in 9.4, will be recognized for purposes of filling permanent vacancies on a shift; i.e., a job opening due to termination, retirement or increase in the work force. Company agrees to post all permanent job vacancies by shift, to include days off and any work specialty, if required. The Company retains the

right to make the final assignment based upon its judgment regarding the skills and abilities required to maintain efficient operation.

## ARTICLE 10
## TERMINATION

10.1        The Company shall have the right to discipline and discharge employees for just cause.

10.2        Unless otherwise agreed, a disciplinary record more than twelve (12) months old may not be used for new disciplinary purposes, but may be used to demonstrate a pattern of conduct or to assess an individual's overall employment suitability.

10.3        Any employee who is being suspended without pay for investigatory purposes shall be informed of the reasons, in writing, and investigations shall not normally exceed three (3) weekdays. Nothing in this Article shall be construed as limiting or otherwise affecting the Company's right to discipline employees.

## ARTICLE 11
## LEAVES OF ABSENCE

11.1        An employee who has one (1) year of continuous service (exclusive of temporary employees) shall be granted a leave of absence without pay for a period not to exceed three (3) months for reasons of bona fide illness, injury or maternity.  An additional three (3) months may be provided at the Company's discretion for the same reason, provided that medical documentation is provided in conjunction with the request for extension.  Leaves of absence, without pay, not exceeding thirty (30) days may be granted by the Company at its discretion for other reasons, the duration of which shall be mutually agreed upon by the Company and the employee.  All leaves of absence shall be in writing with a copy to the Union.  Subject to the provisions of this Article, leaves of absence shall not operate to break an employee's continuity of service for seniority purposes.

11.2        Except where required by law, leaves of absence shall be without pay.  During a leave, an employee shall continue to accrue seniority but time spent on a leave shall not count for the computation of vacation benefits.

11.3        The Company agrees to provide the same Bereavement Leave policy to bargaining unit members as is provided for its non-union employees. Employees shall be eligible for such bereavement leave benefit as may be provided to eligible non-union employees.

## ARTICLE 12
## SAFETY AND HEALTH

12.1        The Company shall maintain reasonable provisions for the safety and health of its employees.

12.2        Employees shall comply with all safety policies and practices established by the Company and shall cooperate with the Company in the enforcement of safety measures.

12.3        The Company may require an employee to submit to a medical examination at the Company's expense if at any time it concludes that there is question as to the employee's mental or physical qualifications for employment by the Company.

12.4        The Company shall provide employees with required safety equipment.

## ARTICLE 13
## BULLETIN BOARDS

13.1        The Company agrees to provide a bulletin board in the Laundry, Central Plant and the Property Operations Shop for authorized Union representatives to keep members informed concerning Union meetings, Union elections, recreational events, and social affairs.  The Union agrees not to post any derogatory or

8

inflammatory notices. The Union's shop steward shall be provided with a key to the bulletin board and shall be responsible for the posting of said notices.

## ARTICLE 14
## GROUP WELFARE, VACATION, HOLIDAY AND PENSION BENEFITS

**14.1**        The Company shall continue to provide to bargaining unit employees the same group health and life insurance benefits, the same vacation benefits, and the same holiday benefits it provides to the majority of its other hourly employees.

**14.2**        The Company agrees to contribute into the Stationary Engineers Local 39 Pension Trust Fund, at its respective office in San Francisco, California, or such other designated place of payment, the following amount:

| | |
|---|---|
| Effective June 20, 2004 | $2.05 |
| Effective June 20, 2005 | $2.20 |
| Effective June 20, 2006 | $2.35 |
| Effective June 20, 2007 | $2.60 |
| Effective June 20, 2008 | $2.85 |

for all straight time hours worked or paid for.

The above contributions shall be made on or before the tenth (10th) day of each month, for pension benefits, programs and plans, as now specified, and as may be hereinafter specified by said Trustees.

The Employer agrees to accept, assume and be bound by all of the obligations imposed upon individual employers by those certain agreements referred to for convenience as the Stationary Engineers Local 39 Pension Trust Agreement. (A copy of which has been delivered to the Company herein and receipt of which is expressly acknowledged) and amendments or modifications, changes or mergers with respect to said Trust Agreement made by the parties thereto.

The undersigned further agrees that he or it does irrevocably designate and appoint the employers mentioned in said Pension Trust as his or it attorneys-in-fact for the selection, removal and substitution of Trustees as provided for in said Trust Agreement and as may be hereinafter provided by or pursuant to said Trust Agreements.

In the event the individual employer herein fails to pay the amounts of Trust Fund contributions due and owing for the period in which they are due and owing, the individual employer shall pay in addition to the amounts due as contributions, such additional liquidated damages and/or attorneys' fees as are set forth in the Trust Agreement to which the individual employer is bound.

**14.3**        The Company shall have the sole right to determine when vacation shall be taken based upon the Company's judgment regarding the skills and abilities required to maintain efficient operations. Such judgment shall not be subject to the grievance/arbitration procedure set forth in Article 6.

Employees shall be entitled to take earned vacation in single or multiple (less than five) days in accordance with the chart below. The rest of the earned vacation shall be taken in five (5) day increments. For multiple days of vacation there shall be a minimum of fourteen (14) days prior notice.

| Earned Vacation | Days Available for Single/Multiple Use |
|---|---|
| 1 week | 5 days |
| 2 weeks | 5 days |
| 3 weeks | 10 days |
| 4 weeks | 10 days |

(a)        The vacation schedule may be changed only in the event of mutual agreement or unforeseen circumstances which deprive the Company of employees with the skill and abilities

9

necessary to maintain efficient operations. Such schedule changes are subject to the grievance/arbitration procedures set forth in Article 6.

## ARTICLE 15
## CALL-BACK PAY

15.1        An employee that is called back to work after having gone home from work shall be paid at his straight time rate for a minimum of four (4) hours or the appropriate overtime rate for the hours worked, whichever is greater.

## ARTICLE 16
## SUBCONTRACTING

16.1        In exercising its right to subcontract work under Article 4, Management Rights the Company shall have the unrestricted right to contract out warranty work, service contract work and work that cannot be performed by the house crew due to either lack of technical skills or knowledge or lack of equipment or other facilities in the work area. In addition, the Company has the unrestricted right to subcontract as it has in the past. Before subcontracting kinds of work not previously subcontracted, the Company shall notify the Union in advance and give the Union an opportunity to discuss such action, provided there are employees working at the time of the subcontracting who are qualified to perform the work and that the subcontracting will result in a loss of work to employees which they had performed.

## ARTICLE 17
## UNION REPRESENTATIVES

17.1        Non-employee Union representatives shall have the following rights of access to bargaining unit employees on the Company's property:

   (a)        access shall be limited to enabling the Union to contact bargaining unit employees so as to provide Union with information necessary for administering this Agreement.

   (b)        the Union shall designate in writing to the Company the names of two representatives who may exercise the Union's access rights;

   (c)        except as provided below, the designated Union representatives may take access at reasonable times whenever bargaining unit employees are working.

   (d)        the designated Union representatives shall have access only to areas where bargaining unit employees are working. The Union shall be allowed to access bargaining unit employees on break in the employee cafeteria, provided that such access does not, in management's sole discretion, unduly interfere with any aspect of the operation. Management shall have the right to rescind this grant of access at any time (by providing notice either verbally or in writing), and such revocation shall be addressed through the process outlined in Article 17.4 below (as opposed to Article 6, which is expressly excluded); Revocation or modification of this right of access shall not be subject to Article 6.

   (e)        in no case shall such access interfere with the work of any Company employee or with a customer's or guest's activities or otherwise disrupt the Company's operations;

   (f)   .    before entering onto the Company's property for the purpose of contacting bargaining unit employees, the designated Union representatives shall:

      (1)        notify representatives designated by the Company;
      (2)        state the area to be visited, the employees to be contacted, and the reason for needing to have access to employees on the Company's property; and
      (3)        obtain the prior approval of one of the Company representatives.

10

The Company representatives shall notify the Company's security staff and arrange for entry of the Union representatives onto the Company's property. Upon entering the Company's property, the Union representative shall proceed directly to the area where the employees to be contacted are working and shall leave the Company's property as soon as he has completed his discussions with the employees contacted. When the Company representative finds it necessary, he may accompany the Union representative from the Employee Entrance to the area where the employees to be contacted are working and also may accompany the Union representative back to the Employee Entrance. The Company representative shall not interfere with the communication of information from the employees to the Union representative.

17.2        The Union may select from among the employees a Job Steward whose duties as Job Steward shall be to report to the Business Representative of the Union grievances or alleged violations of this Agreement. The Union shall notify the Company in writing of the employee selected as Job Steward. The Steward shall not leave his work station without the prior permission of his supervisor and shall not in any way interfere with the Company's operations. The Company may require the Steward to clock out and in if he is permitted to perform his duties as Steward during working time.

17.4        In the event that the Union believes that its access to bargaining unit employees has been improperly or unnecessarily obstructed or impeded, the Union shall notify the Labor Relations Manager (or designee) in writing, and the Company will agree to meet (in a timely manner) with the Union's representative(s) to discuss the Union's concerns. The Company shall agree to meet within a reasonable timeframe following the request from the Union.

## ARTICLE 18
## TOOLS – TRANSPORTATION – CLOTHING

18.1        Tools. The Company will provide a safe place for employees to keep their tools. The Company further agrees that tools which are broken or damaged on the job during the performance of work for the Company, shall be replaced with a like tool or repaired by the Company at no cost to the employee. Employees shall furnish those small hand tools which are customarily used to perform the work involved. The Company shall either furnish all power or special tools or make mutually satisfactory financial arrangement with employees to compensate them for the use of such tools furnished by them.

18.2        The Company shall continue its practice of providing uniforms for employees required to wear such clothing.

## ARTICLE 19
## JURY DUTY

19.1        Employees who are unable to work due to jury duty service will receive the difference between the payment they receive for jury duty service and their regular straight time shift rate of pay. Employees released from jury duty shall report to work if time allows.

19.2        To be eligible for payment under this Section, the employee must notify the Company of jury duty call when notified and must be a non-probationary permanent full-time employee when the summons is received.

19.3        Maximum benefit under this Section is thirty (30) days in any twelve (12) month period.

## ARTICLE 20
## GENERAL

20.1        No employee covered by this Agreement shall be compelled or permitted to enter into any individual contract or agreement with the Company concerning the conditions of employment set forth herein.

20.2     In the event any provisions of this Agreement are adjudged by a tribunal having jurisdiction to be violative of any applicable federal or state law, such provisions shall become inoperative, but all other provisions of this Agreement shall remain in full force and effect.

## ARTICLE 21
## APPRENTICESHIP

21.1     The Company shall participate in the Union's apprenticeship program, provided that in the event of a conflict between the Apprenticeship Standards and this Agreement, the terms of this Agreement shall prevail.

21.2     The Company shall contribute to the Union's Apprenticeship Fund $150.00 per year for each engineer employed by the Company during the month of January.

21.3     The Union agrees to make a concerted effort to enhance class offerings locally, and that the Company will be actively involved in the development of these classes.

## ARTICLE 22
## WAGES

22.1     The Company shall pay the hourly wage rates listed in Appendix "A".

## ARTICLE 23
## COMPLETE AGREEMENT AND WAIVER

23.1     This Agreement supersedes and cancels all prior practices and agreements, whether written or oral, unless expressly stated to the contrary herein, and together with any letters of understanding executed concurrently (or after) with this Agreement constitutes the complete and entire agreement between the parties, and concludes collective bargaining (except as provided for in the grievance procedure) for its term.

23.2     The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge of contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

## ARTICLE 24
## UNION SECURITY

24.1     Subject to the provisions of the Labor-Management Relations Act, 1947, as amended, it shall be a condition of employment hereunder that all employees covered by this Agreement who are members of the Union in good standing on the date of execution of this Agreement shall remain members in good standing throughout their employment by the Company, and those who are not members of the Union on the date of execution of this Agreement, shall, on the 30th day following execution of this Agreement, become and remain members of the Union though out their employment by the Company. It shall also be a condition of employment hereunder that all employees covered by this Agreement shall, on or after the 30th day following the employee's first employment by the Company in the classification covered hereunder, become and remain members of the Union through out their employment with the Company.

24.2     Notwithstanding anything to the contrary therein, the above paragraph shall not be applicable if all or any part thereof shall be in conflict with applicable law; provided, however, that if all or any part becomes permissible by virtue of a change in applicable law, whether by legislative or judicial action, the provisions held valid shall immediately apply.

24.3     The Union will indemnify and save the Company harmless against any and all claims, demands or other forms of liability which may arise out of or by reason of any action taken or not taken by the Company at the request of the Union in accordance with the provisions of this Article.

24.4    The Company shall check off and remit to the Union work dues for all employees who have executed and furnished to the Company a payroll deduction authorization in the form set forth in Exhibit 1 attached hereto, which by this reference is made a part hereof.

**ARTICLE 25**
**DURATION**

25.1    This Agreement shall be in effect from June 20, 2004 to midnight June 30, 2009, and from year to year thereafter, unless either party gives written notice of its desire to terminate or modify this Agreement at least sixty (60) days prior to June 30, 2009 or sixty (60) days prior to any subsequent anniversary date thereof.

INTERNATIONAL UNION OF
OPERATING ENGINEERS
STATIONARY LOCAL NO. 39,
AFL-CIO

**Jerry Kalmar, Business Manager**

**Madison Bland, President**

**Jerry Frederick, Business Representative**

**Mark Larson, Member/Negotiator**

**Jim Emert, Member/Negotiator**

FHR CORPORATION
d/b/a RENO HILTON

**Tim Maland, President**

**Ed Wright, Assistant Director – H.R.**

13

**APPENDIX A**

<u>WAGES</u>

| | Hourly Rate | | | | |
|---|---|---|---|---|---|
| | 6/20/04 | 6/20/2005 | 6/20/2006 | 6/20/2007 | 6/20/2008 |
| **Journeyman** | $21.54 | $21.81 | $22.08 | $22.35 | $22.63 |
| | | | | | |
| **Draftsman** | $13.48 | $13.64 | $13.82 | $13.99 | $14.16 |
| | | | | | |
| **Utility - 1 year** | $11.81 | $11.95 | $12.10 | $12.25 | $12.41 |
| **Utility - 6 months** | $10.58 | $10.71 | $10.85 | $10.98 | $11.12 |
| **Utility - Start** | $9.55 | $9.67 | $9.79 | $9.91 | $10.03 |
| | | | | | |
| | Hourly Rate | | | | |
| **Apprenticeship Rates** | 6/20/04 | 6/20/2005 | 6/20/2006 | 6/20/2007 | 6/20/2008 |
| 1st 6 months | $14.00 | $14.18 | $14.36 | $14.53 | $14.72 |
| 2nd 6 months | $14.00 | $14.18 | $14.36 | $14.53 | $14.72 |
| 3rd 6 months | $15.08 | $15.26 | $15.46 | $15.65 | $15.84 |
| 4th 6 months | $16.15 | $16.35 | $16.56 | $16.76 | $16.97 |
| 5th 6 months | $17.23 | $17.45 | $17.67 | $17.89 | $18.11 |
| 6th 6 months | $18.31 | $18.53 | $18.77 | $19.00 | $19.24 |
| 7th 6 months | $19.38 | $19.62 | $19.87 | $20.12 | $20.37 |
| 8th 6 months | $20.46 | $20.72 | $20.98 | $21.24 | $21.51 |

14

(#1)

## MEMORANDUM OF UNDERSTANDING

The Company may create Lead Person positions. The Company shall be the sole judge as to how and when the Lead Person positions are to be filled. The rate of pay for the Lead Person position will be no less than ten percent (10%) higher than the highest paid employee under his/her charge. The Company reserves the right to demote back to his/her former classification and rate of pay any employee that has not served in this Lead Person capacity the satisfaction of supervision during that Lead Person's first one hundred and twenty (120) days of Lead Person status. A Lead Person returning to his/her former classification under this provision will suffer no loss of seniority or other benefit in his/her former classification.

Lead Persons shall assist the Director of Facilities and the Assistant Director of Facilities in the performance of their duties and shall direct the work crew. Duties include providing input for annual employee evaluations and advising management of problem situations regarding performance and safety. Lead Persons do not discipline employees or perform other duties normally reserved to supervisors or managers.

The Company agrees that it will utilize its best efforts to assign manageable groups of employees to Lead Persons.

INTERNATIONAL UNION OF
OPERATING ENGINEERS
STATIONARY LOCAL NO. 39,
AFL-CIO

**Jerry Kalmar, Business Manager**

**Madison Bland, President**

**Jerry Frederick, Business Representative**

**Mark Larson, Member/Negotiator**

**Jim Emert, Member/Negotiator**

FHR CORPORATION
d/b/a RENO HILTON

**Tim Maland, President**

**Ed Wright, Assistant Director – H.R.**

15

(#2)

## MEMORANDUM OF UNDERSTANDING

<u>Life Resources Assistance program (LRAP)</u>

It is agreed that if this benefit is incorporated in any other collective bargaining agreement with the Reno Hilton, it will be automatically included in the Local 39 agreement.

INTERNATIONAL UNION OF
OPERATING ENGINEERS
STATIONARY LOCAL NO. 39,
AFL-CIO

**Jerry Kalmar, Business Manager**

**Madison Bland, President**

**Jerry Frederick, Business Representative**

**Mark Larson, Member/Negotiator**

**Jim Emert, Member/Negotiator**

FHR CORPORATION
d/b/a RENO HILTON

**Tim Maland, President**

**Ed Wright, Assistant Director – H.R.**

16

(#3)

## MEMORANDUM OF UNDERSTANDING

<u>Shift Differential/Paid Sick Leave</u>

Management agrees to meet with the Union to discuss shift differentials/paid sick leave in the event these benefits are negotiated and become part of any other collective bargaining agreement during the terms of this contract.

INTERNATIONAL UNION OF
OPERATING ENGINEERS
STATIONARY LOCAL NO. 39,
AFL-CIO

FHR CORPORATION
d/b/a RENO HILTON


**Jerry Kalmar, Business Manager**


**Tim Maland, President**


**Madison Bland, President**


**Ed Wright, Assistant Director – H.R.**


**Jerry Frederick, Business Representative**


**Mark Larson, Member/Negotiator**


**Jim Emert, Member/Negotiator**

17

(#4)

MEMORANDUM OF UNDERSTANDING

The parties agree and acknowledge that the Company's required contributions to employees' pension benefits, as expressed in Article 14.2, apply to straight time hours worked or paid for only, and do not apply to overtime hours worked or paid.

INTERNATIONAL UNION OF
OPERATING ENGINEERS
STATIONARY LOCAL NO. 39,
AFL-CIO

FHR CORPORATION
d/b/a RENO HILTON

**Jerry Kalmar, Business Manager**

**Tim Maland, President**

**Madison Bland, President**

**Ed Wright, Assistant Director – H.R.**

**Jerry Frederick, Business Representative**

**Mark Larson, Member/Negotiator**

**Jim Emert, Member/Negotiator**

18

**I.U.O.E. STATIONARY ENGINEERS LOCAL 39**
**PENSION FUND**
**ASSOCIATED THIRD PARTY ADMINISTRATORS**
1640 South Loop Road • Oakland, CA 94502 • (510) 864-6450 • FAX: (510) 337-3060

Via Certified Mail, Return Receipt Requested
Via U.S. Mail, First Class

August 2, 2007

Reno Hilton
2500 East Second St.
Reno, Nevada 89502

Re:    Assessment of Withdrawal Liability
       ER#: 6045003      000006·0454·003

Dear Employer:

Trust Records reflect that the sale of your firm in 2006 has resulted in a "withdrawal" under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) and the Deficit Reduction Act of 1984 (DEFRA). The Stationary Engineers Local 39 Pension Plan experienced an Unfunded Vested Liability (UVL) as of December 31, 2005 of $49,869,026.00. The Multiemployer Pension Plan Amendments Act of 1980, the Deficit Reduction Act of 1984, and the rules of the Plan require assessment of withdrawal liability on an employer that withdraws from the Plan.

The Plan's Actuary has determined that your share of the UVL is **$407,265.96.** Please refer to the Calculation of Withdrawal Liability Assessment on the following page for detail of the calculation. In accordance with ERISA § 4219(c)(3), annual payments may be made in 5 equal installments due quarterly. Based on the attached Calculation of Withdrawal Liability Assessment, you must pay this liability in no more than 5 quarterly payments of **$70,804** each, with a final payment of **$70,978 (includes interest at 7.75%)**. Your payment in full, or your required first quarterly payment to the Stationary Engineers Local 39 Pension Trust must be received no later than **September 30, 2007** in accordance with ERISA § 4219 (c)(2) and Plan rules. Any request for review of specific matters or identification of any inaccuracy in the assessment must be received by the Plan no more than 90 days after receipt of this letter. A request for review does not postpone the deadline for making the payment or payments described above.

If you have any questions, please write to the Trust Fund office at the address noted above.

Sincerely,

Michael Schumacher
Fund Manager, for the Board of Trustees

CC: Board of Trustees
    Grand Sierra
    Linda Baldwin Jones

**EXHIBIT B**

I.U.O.E. Stationary Engineers Local 39 Pension Plan
Calculation of Withdrawal Liability Assessment

| | | |
|---|---|---|
| 1). | 12/31/2005 Unfunded Vested Benefits | $49,869,026.00 |
| 2). | Employer name | The Reno Hilton Hotel |
| 3). | Employer number(s) | 60454003 |
| 4). | Contributions 2001 | $207,497.12 |
| 5). | Contributions 2002 | $226,415.20 |
| 6). | Contributions 2003 | $241,392.01 |
| 7). | Contributions 2004 | $238,993.89 |
| 8). | Contributions 2005 | $268,679.52 |
| 9). | 5-year contribution total of employer – sum of items (4) – (8) | $1,182,977.84 |
| 10). | 5-year contribution total of all employers | $144,853,628.78 |
| 11). | Employer share of total contributions – item (9)/item (10) | .0081667 |
| 12). | Allocated amount – item (1) x item (11) | $407,265.96 |
| 13). | De minimis amount | $0 |
| 14). | Assessment – item (12) – item (13) | $407,265.96 |

15). Ten plan years of hours of contributed

| | |
|---|---|
| 1996 | 126,772 |
| 1997 | 129,316 |
| 1998 | 130,116 |
| 1999 | 121,755 |
| 2000 | 124,268 |
| 2001 | 126,522 |
| 2002 | 127,918 |
| 2003 | 127,048 |
| 2004 | 116,582 |
| 2005 | 122,127 |

| | | |
|---|---|---|
| 16). | Highest 3 year average annual hours | 128,735 |
| 17). | Highest contribution rate during past ten years+ | $2.20 |
| 18). | Annual payment – item (16) x item (17) | $283,217 |
| 19). | Quarterly payment – item (18)/4 | $70,804.25 |
| 20). | Number of full quarterly payments | 5 |
| 21). | Amount of final payment (includes interest) | $70,978.67 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- 1st payment must be received no later than September 30, 2007
- 2nd quarterly payment must be received no later than December 31, 2007
- 3rd quarterly payment must be received no later than March 31, 2008
- 4th quarterly payment must be received no later than June 30, 2008
- 5th quarterly payment must be received no later than September 30, 2008
- Final payment must be received no later than December 31, 2008

※֍ JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
PAUL BENSI, BART FLORENCE, JERRY KALMAR, and LYLE SETTER, in their capacities as Trustees of the PENSION FUND OF STATIONARY ENGINEERS LOCAL 39

## DEFENDANTS
FHR CORPORATION, a Nevada Corporation, doing business as RENO HILTON

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Linda Baldwin Jones, Bar No. 178922
Andrea Laiacona, Bar No. 208742
WEINBERG, ROGER & ROSENFELD
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury - Med. Malpractice
- [ ] 365 Personal Injury - Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  Habeas Corpus:
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [X] 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus - Alien Detainee
- [ ] 465 Other Immigration Actions

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 USC Sections 1132, 1401(b), 1451; 29 USC Section 185

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 407,265.96

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
[X] SAN FRANCISCO/OAKLAND    [ ] SAN JOSE

DATE July 24, 2008

SIGNATURE OF ATTORNEY OF RECORD
Linda Baldwin Jones

NDC-JS44

ORIGINAL

AO 440 (Rev. 03/08) Civil Summons

# UNITED STATES DISTRICT COURT

### for the

Northern District of California

E-filing    EMC

| | |
|---|---|
| See Attached | ) |
| _____ | ) CV 08    3574 |
| Plaintiff | ) |
| v. | ) Civil Action No. |
| FHR CORPORATION, a Nevada Corporation, doing | ) |
| business as RENO HILTON | ) |
| Defendant | ) |

### Summons in a Civil Action

To: <u>FHR Corporation</u> _____

*(Defendant's name)*

A lawsuit has been filed against you.

    Within <u>20</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, whose name and address are:

Linda Baldwin Jones, Bar No. 178922

Andrea Laiacona, Bar No. 208742

WEINBERG, ROGER & ROSENFELD

1001 Marina Village Parkway, Suite 200

Alameda, CA  94501

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

| | |
|---|---|
| | Richard W. Wieking |
| | Name of clerk of court |
| Date: _JUL 2 5 2008_____ | _____ |
| | Deputy clerk's signature |
| | **ANNA SPRINKLES** |

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

NDCAO440

ATTACHMENT TO SUMMONS

PAUL BENSI, BART FLORENCE, JERRY KALMAR, and LYLE SETTER, in their capacities as Trustees of the PENSION FUND OF STATIONARY ENGINEERS LOCAL 39,

Plaintiffs